1   Thomas S. Arthur (Cal. State Bar No. 070030)
    tarthur@frandzel.com
2   Tricia L. Legittino (Cal. State Bar No. 254311)
    tlegittino@frandzel.com
3   FRANDZEL ROBINS BLOOM & CSATO, L.C.
    6500 Wilshire Boulevard, Seventeenth Floor
4   Los Angeles, California 90048-4920
    Telephone: (323) 852-1000
5   Facsimile: (323) 651-2577

6   Attorneys for Defendants Citibank, N.A.
    and Citibank (West), F.S.B.
7

8                  UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10

11  SYED NAQVI ON BEHALF OF THE          CASE NO.  2:10-cv-03301 JHN-AJWx
    SYED   NAQVI   ROLLOVER   IRA
12  ACCOUNT  and  PATRICK  WALSH          [Hon. Jacqueline H. Nguyen]
    ON BEHALF OF THE PATRICK J.
13  WALSH       ROLLOVER       IRA
    ACCOUNT,                             NOTICE OF MOTION AND MOTION
14                                       BY DEFENDANTS CITIBANK,
              Plaintiffs,                N.A.,AND CITIBANK (WEST) F.S.B
15                                       FOR SUMMARY JUDGMENT OR, IN
    v.                                   THE ALTERNATIVE, SUMMARY
16                                       ADJUDICATION OF CLAIMS;
    CITIBANK, N.A.; CITIBANK (WEST)      MEMORANDUM OF POINTS AND
17  F.S.B.  and  DOES  1   through  20,  AUTHORITIES; DECLARATIONS
    inclusive,                           OF TRICIA L. LEGITTINO,
18                                       HAROON AMINI AND DR. ANIL V.
              Defendants.                SHAH
19
                                         Date:    April 11, 2011
20                                       Time:    2:00 p.m.
                                         Ctrm:    790
21
                                         [SEPARATE STATEMENT OF
22                                       UNCONTROVERTED FACTS AND
                                         CONCLUSIONS OF LAW FILED
23                                       CONCURRENTLY HEREWITH]

24

25

26

27

28

812356.3 | 019930-0419

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/ADJUDICATION

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ............................................4

I       INTRODUCTION ........................................................................................4

II      STATEMENT OF FACTS ...........................................................................5
        A.      Naqvi's Investment in OCPIN ........................................................8
        B.      Walsh's Investment in OCPIN........................................................9

III     THE COURT MAY GRANT SUMMARY JUDGMENT AS TO ALL
        OR PART OF THE PLAINTIFFS' CLAIMS ...................................... 12

IV      CITIBANK IS ENTITLED TO A JUDGMENT AS A MATTER OF
        LAW ON PLAINTIFFS' BREACH OF CONTRACT CLAIMS ................. 13

V       ALL OF PLAINTIFFS' TORT CLAIMS ARE BARRED .......................... 15

VI      THE CLAIM FOR BREACH OF FIDUCIARY DUTY HAS NO
        MERIT .................................................................................................. 16

VII     THE CLAIM FOR NEGLIGENCE HAS NO MERIT ................................. 20

VIII    THE CLAIMS FOR NEGLIGENT AND INTENTIONAL
        MISREPRESENTATION HAVE NO MERIT............................................. 21

IX      THE CLAIM FOR VIOLATION OF SECURITIES LAW HAS NO
        MERIT .................................................................................................. 24

X       THE CLAIMS FOR INADEQUATE TRAINING AND FOR AN
        ACCOUNTING HAVE NO MERIT............................................................ 25

XI      THE CLAIM BASED ON "TORT OF ANOTHER" HAS NO MERIT ....... 25

XII     ALL CLAIMS ASSERTED BY NAQVI ARE BARRED BY THE
        STATUTE OF LIMITATIONS IN ANY EVENT......................................... 26

XIII    CONCLUSION........................................................................................ 28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/ADJUDICATION

# **TABLE OF AUTHORITIES**

**Page(s)**

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.,*
   477 US 242, 106 S.Ct. 2505 (1986) ................................................................. 12

*Bank of California, N.A. v. Opie,*
   663 F.2d 977, 980 (9th Cir. 1981) ................................................................. 13

*Barker v. Norman,*
   651 F.2d 1107 (5th Cir. 1981) ......................................................................... 12

*Blankenship v. Liberty Life,*
   486 F.3d 620 (9th Cir. 2007) ........................................................................... 17

*Celotex Corporation v. Catrett,*
   477 U.S. 317, 106 S.Ct. 2548 (1986) ............................................................ 12

*Conder v. Home Savings of America,*
   680 F. Supp. 2d 1168 (C.D. Cal. 2010) ......................................................... 13

*Glenn K. Jackson Inc. v. Roe,*
   273 F.3d 1192 (9th Cir. 2001) ......................................................................... 21

*Goldblatt v. FDIC,*
   105 F. 3d. 1325 (9th Cir. 1997) ...................................................................... 18

*Guaranty Trust Co. of New York v. York,*
   326 U.S. 99 (1945) ........................................................................................... 27

*Hines v. Fiserv, Inc.,*
   2010 U.S. Dist. LEXIS 39896 (M.D.Fla. March 25, 2010) ....................... 17

*Holtz v. J.J.B. Hilliard,*
   1 F.Supp.2d 887 (S.D.Ind. 1998) ................................................................... 19

*In re Brocade Communications Systems, Inc. Derivative Litigation,*
   615 F.Supp.2d 1018 (N.D. Cal. 2009) ........................................................... 27

*Lopez v. U.S. Bank Nat'l Assn,*
   2010 U.S. Dist. Lexis 90301 ........................................................................... 23

*Matkin v. Fidelity National Bank,*
   2002 U.S. Dist. LEXIS 27571 (D.S.C. July 11, 2002) ................................ 17

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/ADJUDICATION

*Robi v. Five Platters, Inc.*,
   918 F.2d 1439 (9th Cir. 1990) .................................................................... 13

*Rodenberg v. Chiropractic Journal*,
   2009 U.S. Dist. LEXIS 118869 (S.D.Cal. 2009) ..................................... 16

*Scott v. Branch Banking and Trust*,
   588 F.Supp.2d 667 (W.D.V.A. 2008) ...................................................... 21

**STATE CASES**

*Apollo Capital Fund LLC. v. Roth Capital Partners*,
   158 Cal.App.4th 226 (2007)..................................................... 16, 17, 19

*Applied Equipment Corp. v. Litton*,
   7 Cal.4th 503 (1994)............................................................................... 15

*Brown v. California Pension Administrators*,
   45 Cal.App.4th 333 (1996).............................................................. 18, 20

*Century Indemnity Co. v. Sup. Ct.*
   (1996) 58 Cal.Rptr.2d 69 ....................................................................... 28

*Cowburn v. Leventis*,
   619 S.E. 2d 437 (2005)........................................................................... 17

*Ersa Gae Corp. v. Fluor Corp.*
   1 Cal. App. 4th 613 (1991) ..................................................................... 13

*Garcia v. W&W Community Development*,
   186 Cal.App.4th 1038 (2010)............................................................ 20, 21

*Gorman v. Tassajara Development Corp.*,
   178 Cal.App.4th 44 (2009)...................................................................... 26

*Hobart v. Hobart Estate Co.*,
   26 Cal.2d 412 (1945).............................................................................. 22

*Kirschner Brothers Oil, Inc. v. Natomas*,
   185 Cal.App.3d 784 (1986)..................................................................... 16

*LaMonte v. Sanwa Bank of California*,
   45 Cal. App. 4th 509 (1996) ................................................................... 16

*Landale-Cameron Court, Inc. v. Ahonen*
   (2007) 66 Cal.Rptr.3d 776 ..................................................................... 28

*Manok v. Fishman*
   (1973) 31 Cal.App.3d 208 ...................................................................... 28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/ADJUDICATION

*Robinson Helicopter Company, Inc. v. Dana Corp.,*
   34 Cal. 4th 979 (2004) ........................................................................................... 16

*Rodriquez v. Bank of the West,*
   162 Cal.App.4th 454 (2008) ................................................................................. 21

*Rosenthal v. Great Western,*
   14 Cal. 4th 394 ............................................................................................... 19, 20

*Roth v. Malson,*
   67 Cal. App. 4th 552 (1998) ................................................................................. 13

*Software Design and Application, LTD, v. Hoefer & Arnett, Inc.*
   49 Cal .App. 4th 472, 478-479  (1996) ................................................................. 21

*Spinks v. Clark*
   147 Cal. 439 (1905) .............................................................................................. 22

*Teselle v. McLoughlin,*
   173 Cal.App.4th 156 (2009) ................................................................................. 25

*Twomey v. Mitchum, Jones and Templeton, Inc.,*
   262 Cal.App.2d 690 (1968) .................................................................................. 20

*Van de Kamp v. Bank of America,*
   204 Cal.App.3d 819 (1988) .................................................................................. 18

*Vazquez de Mercado v. Sup. Ct.*
   (2007) 148 Cal. App. 4th 711 ............................................................................... 28

**FEDERAL STATUTES**

§ 408 of the IRC ........................................................................................................ 17, 18

**STATE STATUTES**

California Code of Civil Procedure ("CCP") § 343 ................................................... 27, 28

CCP § 337(1) ................................................................................................................... 28

CCP § 338(a) ................................................................................................................... 28

CCP § 338(d) ................................................................................................................... 28

Corporations Code §§ 25235(a) and (b) ......................................................................... 24

**RULES**
FRCP 56(a), (b) ............................................................................................................... 12
FRCP 56(c)(2) ................................................................................................................. 12

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/ADJUDICATION

<div style="text-align:center;">

NOTICE OF MOTION

</div>

TO THE PARTIES HERETO AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on April 11, 2011, commencing at 2:00 p.m., or as soon thereafter as the parties may be heard, in Courtroom 790 of the above-entitled Court located at 255 East Temple Street, Los Angeles, California defendants Citibank, N.A. and Citibank (West) F.S.B (collectively "Citibank") will move for summary judgment in favor of Citibank and against plaintiffs, Syed Naqvi on behalf of the Syed Naqvi Rollover IRA account ("Naqvi") and Patrick Walsh on behalf of the Patrick J. Walsh Rollover IRA account ("Walsh" and collectively with Naqvi "Plaintiffs") on the Plaintiffs' Complaint (the "Complaint"). Alternatively, Citibank will move for summary adjudication in favor of Citibank and against the Plaintiffs with respect to the following matters:

1.     The first claim for relief in the Complaint has no merit and should be dismissed.

2.     The second claim for relief in the Complaint has no merit and should be dismissed.

3.     The third claim for relief in the Complaint has no merit and should be dismissed.

4.     The fourth claim for relief in the Complaint has no merit and should be dismissed.

5.     The fifth claim for relief in the Complaint has no merit and should be dismissed.

6.     The sixth claim for relief in the Complaint has no merit and should be dismissed.

7.     The seventh claim for relief in the Complaint has no merit and should be dismissed.

8.     The eighth claim for relief in the Complaint has no merit and should be dismissed.

1    9.    The ninth claim for relief in the Complaint has no merit and should be
2  dismissed.

3    The motion is made pursuant to Federal Rules of Civil Procedure ("FRCP"),
4  Rule 56, on the grounds that there is no merit to the Plaintiffs' claims.  The motion
5  will also be based on this notice, the accompanying memorandum of points and
6  authorities and declarations of Tricia L. Legittino, Haroon Amini and Dr. Anil V.
7  Shah as well as the Separate Statement filed and served concurrently herewith, the
8  pleadings, documents and records on file in this action, and on such oral or
9  documentary evidence as may be introduced at the hearing on the motion.

10    This motion is made following the conference of counsel pursuant to L.R. 7-
11  3, which took place on March 3, 2011.

12

13  DATED: March 11,  2011          FRANDZEL    ROBINS    BLOOM    &
14                                  CSATO, L.C.

15

16

17                                  By: _____/s/_____
18                                      TRICIA L. LEGITTINO
19                                      Attorneys for Defendants Citibank, N.A.
                                        and Citibank (West), F.S.B.

20

21

22

23

24

25

26

27

28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Citibank, N.A. and Citibank (West) F.S.B (collectively "Citibank") respectfully submit their memorandum of points and authorities in support of their motion for summary judgment or, in the alternative, summary adjudication.

### I

### INTRODUCTION

In 2004 and 2005 Plaintiffs Sayed Naqvi ("Naqvi") and Patrick Walsh ("Walsh"), both of whom are sometimes hereinafter referred to as "Plaintiffs," invested funds from their IRA accounts in a company called Orange County Physicians Investment Network, LLC ("OCPIN"). Plaintiffs claim that their investments turned out to be worthless. In a fit of buyers' remorse, Plaintiffs have sued Citibank in a misguided attempt to recover their losses.

Citibank is not responsible for Plaintiffs' losses. Plaintiffs liquidated their IRAs at other financial institutions and claim they "rolled over" the funds into new IRA accounts at Citibank. But these claims are refuted by two indisputable facts. First, Naqvi never opened an IRA account at Citibank in 2004 or 2005. Although Walsh may have given some thought to opening an IRA account at Citibank in 2005, it is clear that he never actually did so. Second, Naqvi and Walsh specifically deposited the money from their liquidated IRA accounts at the other financial institutions *directly into OCPIN's account* at Citibank, not to any new IRA accounts in their names at Citibank. Citibank never assumed responsibility for those funds on behalf of Naqvi or Walsh as an IRA custodian or in any other capacity.

Moreover, Citibank did not mislead Naqvi or Walsh into investing in OCPIN. Naqvi and Walsh did so based on their own investigation of OCPIN and with their eyes wide open. Indeed, Naqvi was an insider of OCPIN as one of the founding members of the company and an active manager of the company. Walsh decided to invest in OCPIN based on his own investigation of the company and not on anything

812356.3 | 019930-0419

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/ADJUDICATION

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1  said by Citibank. Indeed, he contractually bound himself to make the investment in
2  OCPIN without any advice or input from Citibank. If Walsh wanted to know about
3  OCPIN, all he had to do was refer to all of the disclosure statements that OCPIN
4  made available.

5      Plaintiffs have asserted a variety of legal theories in their Complaint, but none
6  of them have a basis in fact or law. Summary judgment should therefore be entered
7  in favor of Citibank. If summary judgment cannot be had for any reason, Citibank
8  respectfully submits that the Court should summarily adjudicate the claims
9  described below in favor of Citibank.

10                                    II

11                        STATEMENT OF FACTS

12      The crux of the Plaintiffs' Complaint centers on their investments in OCPIN.
13  OCPIN is a Nevada limited liability company that was created in early 2004 during
14  a lunch time conversation between long time physician colleagues, Naqvi and Dr.
15  Anil Shah ("Shah"). *See*, the accompanying proposed separate statement of
16  uncontroverted facts and conclusions of law filed concurrently herewith (the
17  "Separate Statement"), ¶1. Shah told Naqvi he had heard that Tenent Healthcare
18  Corporation ("Tenent") was going to sell four hospitals it owned in Orange County,
19  including Coastal Communities Hospital in Santa Ana ("Coastal"), which was
20  among the hospitals at which both Shah and Naqvi practiced.[1] Separate Statement,
21  ¶3. The two physicians began to discuss whether it would be possible for them,
22  along with some of their doctor colleagues, to raise enough money to purchase
23  Coastal. Separate Statement, ¶4. Naqvi and Shah discussed their displeasure with
24  the way Coastal was being managed. They believed Coastal had poor infrastructure
25

26      [1] In approximately January 2004, Tenent announced that it was going to sell
   the following four hospitals: Western Medical Center-Santa Ana; Western Medical
27  Center-Anaheim; Coastal Communities Hospital, Santa Ana; and Chapman Medical
28  Center in Orange. Separate Statement, ¶2.

812356.3 | 019930-0419

1  and that they could manage the facility more efficiently.  Separate Statement, ¶5.

2      Over the next several weeks, Naqvi and Shah approached several of their
3  physician friends and raised $5 million.  Naqvi contributed $500,000.  Separate
4  Statement, ¶6.  Informally calling themselves the Coastal Communities Hospital
5  Physicians Investment Group ("CCPIG"), this investor group approached Tenent
6  with a $5 million offer to purchase Coastal.  Tenent refused to sell only one of the
7  hospitals but indicated that it would sell all four hospitals as a package.  Separate
8  Statement, ¶7.

9      Naqvi, Shah and the other members of the CCPIG investor group decided to
10  form an entity to raise the funds to purchase all four hospitals. Separate Statement,
11  ¶¶8,9.  Their plan was to form a limited liability company, which would purchase
12  the majority of shares of Integrated Healthcare Holdings, Inc. ("IHHI").  IHHI was
13  the front runner in the bidding for the hospitals.  Separate Statement, ¶10.

14      To accomplish this plan, Shah, Naqvi and the other CCPIG investors became
15  the founding members of OCPIN.   The $5 million they had already raised to
16  purchase Coastal as CCPIG was contributed to OCPIN.  Separate Statement, ¶11.
17  On November 25, 2004, the OCPIN members, including Naqvi, adopted an
18  operating agreement for OCPIN. Separate Statement, ¶12.  On January 5, 2005,
19  Shah filed articles of organization with the Nevada Secretary of State and officially
20  formed OCPIN.  The company's headquarters were located at 2621 Bristol Street,
21  Santa Ana, California. Separate Statement, ¶13.

22      OCPIN entered into an agreement with IHHI to purchase IHHI stock for $30
23  million.  This transaction would result in OCPIN acquiring 83.07% of IHHI, and the
24  hospitals would then be managed by IHHI.  Separate Statement, ¶14.  As part of this
25  transaction, West Coast Holdings, LLC ("WCH"), another limited liability company
26  in which the OCPIN investors, including Naqvi, had a 51% interest, would acquire
27  the real estate affiliated with the four hospitals.  Separate Statement, ¶14.

28      In or about January 2005 the members of OCPIN contributed an additional $5

812356.3 | 019930-0419

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/ADJUDICATION

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1   million to OCPIN's capital.  Naqvi contributed an additional $500,000 through an
2   investment group called "OC Healthcare," of which he was a member and co-
3   manager.  Separate Statement, ¶15.  Thus, as of January 2005, the members of
4   OCPIN had raised $10 million of the $30 million needed to purchase the IHHI
5   stock.

6          In order to raise the remaining $20 million, OCPIN obtained a loan from
7   Medical Capital (personally guaranteed by Shah).  Separate Statement, ¶15.  The
8   founding members of OCPIN (including Naqvi) sought new investors to repay the
9   Medical Capital loan.   Separate Statement, ¶15.   OCPIN provided potential
10  investors with appropriate disclosure documents (the "Investor Disclosure
11  Documents"), which advised them of the nature of the investment in OCPIN and the
12  risks associated therewith, and obtained from the investors background information
13  and representations.  Separate Statement, ¶16.  The Investor Disclosure Documents
14  were prepared by counsel for OCPIN and were approved by its members, including
15  Naqvi.  The Investor Disclosure Documents included a Subscription Agreement, a
16  Subscription Document, a Private Placement Memorandum, a Hospital Acquisition
17  Transaction Summary, and a Membership Interest Purchase Agreement.  Separate
18  Statement, ¶17.

19         On March 2, 2005, Shah and Naqvi opened a business checking account (the
20  "OCPIN Account") for OCPIN at Citibank's South Coast Plaza branch located at
21  695 Town Center Drive, Costa Mesa, California (the "Town Center Branch").
22  Separate Statement, ¶19.  OCPIN chose to open an account at the Town Center
23  Branch because it was close to OCPIN's headquarters.  Separate Statement, ¶ 20-21.
24  Naqvi had signatory rights to the OCPIN Account since he was a core member of
25  OCPIN and was involved in the daily transactions of the company.   Separate
26  Statement, ¶22.  As new investors signed up, their funds were deposited into the
27  OCPIN Account.  Separate Statement, ¶23.  On November 1, 2005, Naqvi as a co-
28  manager of OCPIN, wrote a check from this account for $2.8 million to purchase

812356.3 | 019930-0419

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/ADJUDICATION

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1    additional IHHI shares. Separate Statement, ¶24.

2      In March 2005, OCPIN hired Richard Carpe ("Carpe"), a CPA, to manage the

3   company's books and records. Separate Statement, ¶25. Carpe took his directions

4   from the OCPIN board and managers and was tasked with creating records to keep

5   track of the investors' accounts in OCPIN. Separate Statement, ¶26. Carpe created

6   detailed reports and spreadsheets using Quicken software to record and track

7   investors' accounts at OCPIN. Separate Statement, ¶27.

8      A.    *Naqvi's Investment in OCPIN*

9      By early 2005 Naqvi had invested $1 million in OCPIN in two separate

10   $500,000 tranches. Separate Statement, ¶28. The first tranche was invested in mid-

11   2004 through OCPIN's predecessor, CCPIG, and was rolled into OCPIN when it

12   was formed. Separate Statement, ¶28. The second tranche came several months

13   later through Naqvi's other limited liability company, OC Healthcare. Separate

14   Statement, ¶28.

15      The allegations in this case concern only $140,000 of the second tranche.

16   Separate Statement, ¶29. Naqvi claims that in late 2004 or early 2005 he "rolled

17   over" $140,000 from an IRA account at Putnam Investments ("Putnam") to an IRA

18   account that, allegedly, had been established for him at Citibank. Separate

19   Statement, ¶30.[2]

20      Documents produced by Naqvi show that he took $99,188.47 in "early

21   distributions" from his Putnam IRA account in September 2004. Separate

22   Statement, ¶ 32. The subscription agreement Naqvi signed with OCPIN in

23   November 2004 shows that he invested $500,000 in the company. However, neither

24   Citibank nor Naqvi have any record of an IRA account being opened for him at

25

26   _____

27      [2] Sometime after he invested, Naqvi approached Carpe and requested that
$140,000 of his total investment in OCPIN be credited to an account which he

28   requested be entitled, "Naqvi IRA". Separate Statement, ¶31.

1    Citibank in 2004 or 2005.[3]  Separate Statement, ¶¶33-34.

2        Naqvi alleges that he relied on the advice of Citibank employees Brian

3    Kenney ("Kenney") and Amir Masliyah ("Amir") to invest the $140,000 in OCPIN.

4    Complaint ¶ 36.  But Naqvi could not recall at his deposition any actual investment

5    advice he received from either of these employees. Separate Statement, ¶36.  Naqvi

6    admitted that he did not seek investment advice from Citibank.   The only reason

7    Naqvi claims to have gone to Citibank was to rollover his IRA from Putnam into an

8    IRA at Citibank.  Separate Statement, ¶37.  Naqvi has admitted that by the time he

9    went to Citibank to rollover his Putnam IRA, he had *already* made the decision to

10   invest in OCPIN.   Separate Statement, ¶38.   Naqvi based this decision on his

11   conversation with Shah and on his own personal belief that OCPIN  was a "good

12   investment."   Separate Statement, ¶39.   This personal belief was based on his

13   experience as an active member of OCPIN in 2004 and by 2005 his position on its

14   board of directors and as one of the company's  managers. Separate Statement, ¶40.

15        B.    *Walsh's Investment in OCPIN*

16        At the time of his investment in OCPIN, Walsh was a physician practicing out

17   of Western Medical in Anaheim ("Western"), one of the four hospitals Tenet

18   announced for sale in January 2004.  Separate Statement, ¶¶2;41.  It is undisputed

19   that Walsh did not have an IRA or any other account at Citibank as of August 2005.

20   Separate Statement, ¶42.

21        Walsh invested $300,000 in OCPIN in two installments.  Separate Statement,

22   ¶43.  The first installment of $278,767.99 was wired into the OCPIN Account on or

23   about August 2, 2005, from the Vanguard Group ("Vanguard") after Walsh

24

25        [3] While Citibank cannot locate an IRA being opened for Naqvi in 2004 or
26   2005, it did determine that as of December 31, 2005, Naqvi had other non-IRA
     accounts which he had opened and maintained at other Citibank branches. During
27   his deposition, Naqvi confirmed the existence of these non-IRA Citibank accounts
28   and that they are not the subject of this lawsuit.  Separate Statement, ¶35.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1   liquidated his Vanguard IRA accounts.   Separate Statement, ¶43.   The second

2   installment of $21,232.01 was made on October 18, 2005, when Walsh's wife,

3   Anna, wrote a check to OCPIN from their personal checking account at Wells Fargo

4   (the "Wells Fargo Check").[4]  Separate Statement, ¶43.

5       Walsh alleges that he based his decision to invest in OCPIN on

6   recommendations he received from Amir and Kenney.   Complaint, ¶¶ 35-37, 39.

7   However, when he testified under oath at his deposition, Walsh admitted that he

8   actually made the decision to invest in OCPIN **before** he or his wife ever spoke to

9   anyone at Citibank.  Separate Statement, ¶48.   In fact, before Walsh sent his wife to

10  Citibank on August 1, 2005, to "do the legwork" to open an IRA account so he

11  could "roll over" his E-Trade and Vanguard IRAs to Citibank, he had already had

12  two separate conversations with a physician colleague at Western.   Separate

13  Statement, ¶49.   This doctor, who was the first person ever to mention OCPIN to

14  Walsh, explained several ideas he had about "how the hospital could be made more

15  profitable, so the investment didn't look as unattractive as it first seemed."  Separate

16  Statement, ¶50.   The only other person with whom Walsh discussed a potential

17  investment in OCPIN was his wife.[5]  Separate Statement, ¶51.   Walsh admitted at

18  his deposition that he did not speak with anyone at Citibank prior to making his

19  decision to invest in OCPIN.  Separate Statement, ¶52.

20      Walsh was in contact with Carpe before Walsh went to Citibank.   Separate

21  _____

22      [4] While Walsh liquidated an IRA he had at E-Trade Financial ("E-Trade") in
    October 2005, neither Walsh nor his wife Anna could confirm that the source of the
23  funds for the Wells Fargo Check was from Walsh's E-Trade IRA. Separate
    Statement, ¶44.

24
        [5] Mrs. Walsh, who has a background as a part-time realtor, interior decorator
25  and sometime manager of her husband's medical practice, testified at her deposition
    that because she is not a physician, she, "...really wouldn't know anything about this
26  as far as hospital investments, so I would have to refer to my husband. If he believed
27  it was safe, I [sic] would have been safe but I don't know." Separate Statement,
    ¶¶45;46.
28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA  90048-4920
(323) 852-1000

1  Statement, ¶53.   On July 29, 2005, Carpe faxed Walsh copies of the Investor

2  Disclosure Documents, including the Hospital Acquisition Transaction Summary

3  and a blank OCPIN and WCH Membership Interest Purchase Agreement.  Separate

4  Statement, ¶53.  The Hospital Transaction Summary explained to Walsh the nature

5  of the investment in OCPIN and how an investment in OCPIN would be

6  apportioned with WCH.   Separate Statement, ¶54.   The Membership Interest

7  Purchase Agreement set forth the terms and conditions for an investment in OCPIN.

8  Separate Statement, ¶55.  The very first page of the Membership Interest Purchase

9  Agreement specifically states that "OCPIN and Purchaser agree that the payment to

10  OCPIN *will be deposited in the General Account of OCPIN* at Citibank (West)

11  FSB."  [Emphasis added.]   Separate Statement, ¶56.  Walsh signed and sent the

12  Membership Interest Purchase Agreements back to Carpe, thereby acknowledging

13  his understanding and agreement that Walsh's funds would be deposited into the

14  OCPIN Account and not his personal IRA account.  Separate Statement, ¶57.   In

15  fact, Walsh testified that when he did meet Amir and Kenney on August 3, 2005

16  (five days after he signed the OCPIN Membership Interest Purchase Agreement) he

17  did not even discuss his investment in OCPIN with them, and they did not tell him

18  an investment in OCPIN was "suitable."  Separate Statement, ¶58.

19      On July 30, 2005, Carpe sent an email to Walsh explaining that Walsh's IRA

20  would be established at OCPIN and that the funds he was investing "will be made

21  payable to . . . OCPIN . . ." and " . . . will be deposited at Citibank (West) FSB."

22  Separate Statement, ¶59.   The next day, Carpe sent Walsh specific wiring

23  instructions and directed that funds be wired directly into the OCPIN Account.

24  Separate Statement, ¶60.  Walsh complied with these instructions.  On July 31,

25  2005, Walsh used the wire instructions he received from Carpe as a template to fill

26  out an E-Trade "Request to Wire Funds," and directed that his liquidated E-Trade

27  IRA account *be wired directly into the OCPIN Account*.  Separate Statement, ¶61.

28      Like Naqvi, Walsh has been unable to produce any document to establish that

812356.3 | 019930-0419

1  he opened an IRA at Citibank in August 2005.  Separate Statement, ¶62.  Although
2  Walsh claims that either Amir or Kenney gave him a Citibank IRA Transfer and
3  Direct Rollover Form ("Rollover Form"), he admits he never filled out or signed an
4  actual IRA Application which the Rollover Form states must be completed and
5  returned to Citibank in order to open an IRA.  Separate Statement, ¶63.  Other than
6  the Rollover Form, Walsh does not recall receiving, and has certainly never
7  produced, any other document from Citibank memorializing the alleged IRA
8  account he claims to have opened in August 2005.  Separate Statement, ¶64.

9                                              III

10  ## THE COURT MAY GRANT SUMMARY JUDGMENT AS TO ALL OR PART
11  ## OF THE PLAINTIFFS' CLAIMS

12        A motion for summary judgment provides a procedure for terminating
13  without trial actions in which there is no genuine issue as to any material fact and
14  the moving party is entitled to judgment as a matter of law.  FRCP 56(c)(2).  A
15  motion for summary judgment pierces the pleadings and puts the opponent to the
16  test of affirmatively coming forward with sufficient evidence for the claims or
17  defenses to create a genuine issue for trial. *Celotex Corporation v. Catrett,* 477 U.S.
18  317, 325, 106 S.Ct. 2548, 2554 (1986).

19        Summary judgment may be granted if there is no genuine issue as to any
20  material fact.  FRCP 56(c)(2).  A fact is "material" if it might affect the outcome of
21  the suit under the governing substantive law.  A factual dispute is "genuine" where
22  the evidence is such that a reasonable jury could return a verdict for the party
23  opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 US 242, 248, 106 S.Ct.
24  2505, 2510 (1986).

25        Courts also have the authority to grant motions for partial summary judgment.
26  Upon a showing that there is no genuine issue of material fact as to particular issues,
27  the court may grant summary judgment as to all or part of those issues.  FRCP 56(a),
28  (b); *Barker v. Norman,* 651 F.2d 1107, 1123 (5th Cir. 1981) (in cases involving

812356.3 | 019930-0419

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1  multiple causes of action, summary adjudication may be proper "as to some causes
2  of action but not as to others, or as to some issues but not as to others, or as to some
3  parties, but not as to others"); *Robi v. Five Platters, Inc.,* 918 F.2d 1439, 1441-1442
4  (9th Cir. 1990) (summary adjudication of issues permitted based on collateral
5  estoppel effect of prior proceeding).

6       In diversity cases, the state law creating the right sued upon governs issues
7       such as the elements of the cause of action, measure of damages and applicable
8       defenses.  Bank of California, N.A. v. Opie, 663 F.2d 977, 980 (9th Cir. 1981).

9                                          IV

10  <u>CITIBANK IS ENTITLED TO A JUDGMENT AS A MATTER OF LAW ON</u>
11  <u>PLAINTIFFS' BREACH OF CONTRACT CLAIMS[6]</u>

12       A cause of action for breach of a written contract requires proof of: (1) the
13  existence of a contract; (2) the plaintiff's performance of the contract; (3) the
14  defendant's breach; and (4) damages to the plaintiff as a result of the breach. *Conder*
15  *v. Home Savings of America,* 680 F. Supp. 2d 1168, 1174 (C.D. Cal. 2010)
16  (dismissing plaintiff's breach of contract claim because of lack of evidence that a
17  contract was entered into with the defendant). It is, of course, basic hornbook law
18  that the existence of a contract is a necessary element to an action based on contract.
19  *Roth v. Malson*, 67 Cal. App. 4th 552, 557 (1998).  Whether a contract is sufficiently
20  definite to be enforceable is a question of law for the Court to decide, *Ersa Gae*
21  *Corp. v. Fluor Corp.* 1 Cal. App. 4th 613, 623, (1991) .

22       Plaintiffs allege in the Complaint that, "At the time each of the plaintiffs
23  opened the accounts described above with the defendants a contract was formed…"
24  Complaint, ¶ 121.  In their responses to form interrogatories, Plaintiffs confirm that
25  the "contract" alleged in the Complaint was a written contract, namely the "IRA

26  _____
27       [6] While Citibank is seeking summary judgment/adjudication as to all claims
    for relief in the Plaintiffs' compliant, for purposes of clarity it is going to address
28  them out of the order in which they are pled.

812356.3 | 019930-0419

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA  90048-4920
(323) 852-1000

Account Agreement." Separate Statement, ¶66.

Plaintiffs' breach of contract claim is fatally flawed. Despite repeated requests, Plaintiffs have never produced the purported contract between them and Citibank.[7] Specifically, in their December 2009 responses to Citibank's Request for Production of Documents, the Plaintiffs stated that they were "searching records for documentation" in connection with the alleged contract. Separate Statement, ¶68. Despite this search, Naqvi has never produced a single document between himself and Citibank. Separate Statement, ¶69. In fact, during his deposition, Naqvi could not remember what documents, if any, he ever filled out in connection with his alleged IRA at Citibank, nor does he recall ever receiving any documents from Citibank after he claims to have opened his IRA. Separate Statement, ¶34. Further, to the extent that Naqvi did receive any documents from Citibank he has either "misplaced" them or no longer has them. Separate Statement, ¶69.

As for Walsh, the only writing he ever produced that even remotely pertains to an alleged contract is the Rollover Form. Separate Statement, ¶70.[8] However, a plain reading of the Rollover Form reveals that it is not a contract between Citibank and Walsh to establish his IRA. Rather, it is a ministerial form used to request that an institution send to Citibank the assets held in an IRA. Separate Statement,¶ 73. In fact, the Rollover Form specifically states, "If you do not have an existing Citibank IRA…you must also complete a Citibank IRA Application"-something which Walsh readily admits that he never did. Separate Statement, ¶¶63 and 73.

Finally, although the Rollover Form contains a "medallion guarantee"

---

[7] Citibank does not have in its possession an IRA Account Application for either Plaintiff from 2004 or 2005 which would be the written contract necessary to open an IRA with Citibank. Separate Statement, ¶67.

[8] Both Walsh and Mrs. Walsh confirmed that they have produced all documents they have in connection with the alleged Citibank IRA. Separate Statement, ¶71. Walsh's counsel even confirms this on the record during Mrs. Walsh's deposition. Separate Statement, ¶72.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1    purportedly signed by Kenney, this signature simply guarantees to the transferring
2    institution that Walsh's signature on the document is genuine. Separate Statement,
3    ¶74. More importantly, Section 6 of the Rollover Form does not contain a signature
4    from an authorized Citibank employee to advise the transferring institution that
5    Citibank has, in fact, accepted the transferring Walsh IRA account as a "Successor
6    Trustee".

7           Based on the above, Citibank is entitled to judgment on the Plaintiffs' claim
8    for breach of contract because there is no evidence that a contract was ever entered
9    into with Citibank.  Plaintiffs' failure to produce contracts evidencing their IRAs
10   with Citibank is fatal to the remainder of their claims as well.

                                         V

                ALL OF PLAINTIFFS' TORT CLAIMS ARE BARRED

13          If the Court determines that Citibank is not entitled to judgment as a matter of
14   law on the Plaintiffs' claim for breach of contract, Citibank respectfully moves for
15   summary adjudication as to the first claim for relief for breach of fiduciary duty, the
16   second claim for relief for negligence, the third claim for relief for negligent
17   misrepresentation, the fourth claim for relief for intentional misrepresentation, the
18   sixth claim for relief for failure to train and supervise, and the ninth claim for relief
19   for tort of another. All of these tort claims are based on an alleged breach of contract
20   and are barred as a matter of law.

21          The Plaintiffs claim that Citibank breach *contractual duties* that were owed to
22   them as a result of their opening IRA accounts at Citibank. Complaint ¶ 121. Tort
23   causes of action do not lie for this alleged breach of contract because conduct that
24   constitutes a breach of contract cannot support tort claims.  "Contract and tort are
25   different branches of law," and the differences between those branches "give rise to
26   distinctions in assessing damages." *Applied Equipment Corp. v. Litton,* 7 Cal.4[th]
27   503, 514-515 (1994).  A plaintiff may not circumvent the distinctions between
28   contract and tort by claiming that conduct constituting a breach of contract also

812356.3 | 019930-0419

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1  satisfies the elements of a tort.  The California Supreme Court has affirmed tort
2  recovery only where the "tortious" conduct was *separate* from the breach of contract
3  itself.  *Robinson Helicopter Company, Inc. v. Dana Corp.,* 34 Cal. 4th 979, 990
4  (2004).

5      Here, the allegedly tortious conduct was not separate or independent from the
6  alleged breach of contract.  On the contrary, the Plaintiffs' tort claims are based on
7  the exact same claim for breach of contract.  For example, in Paragraph, 123 of the
8  Complaint the Plaintiffs expressly state that their breach of contract claim is based
9  on their previous allegations in the Complaint that Citibank, "improperly and
10 imprudently" managed and invested their supposed IRAs. This is nothing more than
11 an unabashed rehash of the claims that Citibank did not perform its obligations
12 under the agreements governing the accounts.  Indeed, the Plaintiffs cannot prevail
13 on their tort claims without proving that Citibank breached its contract with them.
14 Thus, under well-established authority, the Plaintiffs' attempt to enforce their
15 contractual rights through tort claims fails as a matter of law.

16 <div align="center">VI</div>

17 <div align="center">THE CLAIM FOR BREACH OF FIDUCIARY DUTY HAS NO MERIT</div>

18     Plaintiffs' claim for breach of fiduciary duty is based on an allegation that
19 Citibank became their IRA custodians or trustees when they "rolled over" their
20 IRAs. Complaint, ¶¶ 39-40, 62-63. According to the Plaintiffs, Citibank violated its
21 fiduciary duties as an IRA custodian because it allowed Plaintiffs to invest in
22 OCPIN. Complaint ¶¶ 64-65.

23     The existence and scope of fiduciary duties are questions of law. *Kirschner*
24 *Brothers Oil, Inc. v. Natomas*, 185 Cal.App.3d 784, 790 (1986). Plaintiffs must
25 prove the existence of a fiduciary relationship, its breach, and damage caused by the
26 breach. *Apollo Capital Fund LLC. v. Roth Capital Partners*, 158 Cal.App.4th 226,
27 244 (2007); *LaMonte v. Sanwa Bank of California*, 45 Cal. App. 4th 509, 517 (1996).
28 Mere allegations that one "agreed" to perform as a fiduciary are not sufficient.
812356.3 | 019930-0419

1   *Rodenberg v. Chiropractic Journal*, 2009 U.S. Dist. LEXIS 118869, *12-13
2   (S.D.Cal. 2009) (dismissing fiduciary duty claims because there was no showing the
3   defendant knowingly undertook obligations of a fiduciary and the complaint lacked
4   facts to establish a fiduciary relationship had been formally entered into).
5   Conclusionary allegations that an individual "solicited and sold " an investment or
6   "was acting on another person's behalf" do not establish a fiduciary relationship.
7   *Apollo* at 245-246.

8          Plaintiffs cannot establish the existence or breach of fiduciary duties on the
9   part of Citibank for several reasons.   First, as noted above, Plaintiffs have not
10   produced a written agreement establishing any such relationship between
11   themselves and Citibank.   IRAs are tax deferred accounts.   Their creation is
12   governed by the Internal Revenue Code ("IRC"), and Section 408 of the IRC
13   requires that IRAs be created by written instrument.   *See,* 1, Canan, *Qualified*
14   *Retirement Plans,* § 4:10, p. 408 (2010-2011 Ed. ) (an IRA must be a trust created
15   by a written instrument).

16          IRA custodians are not fiduciaries pre se.   *Cowburn v. Leventis*, 619 S.E. 2d
17   437, 451 (2005) (neither the terms of the customer's IRA custodial agreement nor a
18   plain reading of IRC section 408 created a fiduciary duty between the customer and
19   the defendant bank); *Hines v. Fiserv, Inc.*, 2010 U.S. Dist. LEXIS 39896, *9
20   (M.D.Fla. March 25, 2010) (IRC section 408 imposes no duties on IRA custodians);
21   *Matkin v. Fidelity National Bank*, 2002 U.S. Dist. LEXIS 27571, *9 (D.S.C. July 11,
22   2002) (Section 408 does not impose a duty of care on an IRA custodian to prevent a
23   customer from making unwise investment decisions).   An IRA established in
24   accordance with IRC section 408 limits the custodian's duties to ministerial
25   functions such as ensuring that the contributions to the account are in cash, the
26   contributions do not exceed the maximum amount permitted each year, the funds are
27   not commingled or invested in life insurance proceeds, and that the interest in the
28   account is non-forfeitable. *Blankenship v. Liberty Life*, 486 F.3d 620, 626 (9th Cir.

812356.3 | 019930-0419

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1  2007).

2      Accordingly, any duties over and above the ministerial duties prescribed by

3  IRC section 408 must be set forth in a written agreement. *Brown v. California*

4  *Pension Administrators*, 45 Cal.App.4th 333, 348 (1996) (summary judgment

5  affirmed in favor of defendant where documents governing relationship provided for

6  only limited fiduciary duties); *Van de Kamp v. Bank of America*, 204 Cal.App.3d

7  819, 860 (1988) (bank's duties over a custodial account limited to scope set forth in

8  the parties' agreement).   Because there is no written agreement between the

9  Plaintiffs and Citibank, there is no evidence that Citibank owed Plaintiffs any

10  fiduciary duties.

11      Along the same lines, deposits in a bank are presumed to be general unless

12  there is a specific agreement to the contrary evidencing the intent by both the

13  customer and the bank that the deposit is a special deposit.   The burden is on the

14  depositor to overcome this presumption. *Goldblatt v. FDIC*, 105 F. 3d. 1325, 1328

15  (9th Cir. 1997).  In *Goldblatt*, a customer of an insolvent bank claimed that because

16  he had an IRA with the bank his account was a special deposit and he was entitled to

17  fiduciary duties that required he receive a priority payout from the FDIC. *Id*. At

18  1327. While the Court found that special deposits constitute a trust relationship

19  wherein the bank owes a fiduciary duty to the depositor, it needed to review the

20  Custodial Agreement to determine whether the parties had, in fact, entered into a

21  trust-type relationship invoking the fiduciary duties claimed by the plaintiff. *Id*. at

22  1329. Upon review of the Custodial Agreement, the court concluded that the

23  customer had not met his burden to establish that the account was a special deposit

24  because the Custodial Agreement did not create such an account and explicitly

25  carved out any fiduciary duties on behalf of the bank. *Id*.

26      Second, the Rollover Form produced by Walsh did not establish a fiduciary

27  relationship.   A half completed request from one institution to another to transfer

28  funds is not a contract.  Walsh's Rollover Form, in and of itself, did not impose any

812356.3 | 019930-0419

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1  obligations on Citibank, let alone fiduciary obligations. In fact, it is not even signed
2  by anyone at Citibank acknowledging that Citibank has, in fact, accepted the
3  transferring Walsh IRA as Walsh's Successor Trustee. Walsh was responsible for
4  opening an IRA account that conformed to his wishes.  *Holtz v. J.J.B. Hilliard*, 1
5  F.Supp.2d 887, 894-895 (S.D.Ind. 1998) (IRA trustee owed customer no duty to
6  take make sure the account documentation conformed with the customer's estate
7  plan); *Rosenthal v. Great Western*, 14 Cal. 4th 394, 425(1996)  (fiduciary obligations
8  of broker do not extend to orally alerting the customer to certain provisions of the
9  custodial agreement).  It is clear that he never did so.

10      Third, there is no evidence Citibank assumed control of Plaintiffs' funds in the
11  capacity of an IRA custodian.   A key factor in establishing the existence of a
12  fiduciary relationship lies in control by the purported fiduciary over the property of
13  another.   In *Apollo Capital Fund LLC. v. Roth Capital Partners*, 158 Cal.App.4th
14  226 (*supra*) investors sued a broker-dealer that agreed to raise funds for a stock
15  offering.   The Court found that there was no fiduciary relationship between the
16  broker-dealer and the investors for two reasons. First, the investors were not
17  customers of the broker-dealer.   The broker acted as a "placement agent" of the
18  company for which it agreed to raise funds. The Court held that no broker-customer
19  relationship was created when the investors placed their money with the company
20  and that a fiduciary relationship could not be inferred simply because of the
21  defendant's status as a broker. *Id.* at 245.   Second, the court found there was no
22  fiduciary duty because there was no evidence the broker-dealer had control over the
23  plaintiffs' property.   The plaintiffs conceded their funds were placed directly with
24  the company and only passed through the broker-dealer. The court held that the
25  mere placing of a trust in another person does not create a fiduciary relationship. *Id.*
26  at 245-246.

27      The same is true here.   Citibank never had control over Plaintiffs' money
28  because Plaintiffs chose to deposit their money directly into the OCPIN Account.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

812356.3 | 019930-0419

1 | Walsh followed the wire instructions he received from Carpe, and instructed
2 | Vanguard to liquidate his IRA and deposit the funds into the OCPIN Account.
3 | Separate Statement, ¶75. There is no evidence at all that Naqvi ever deposited funds
4 | with Citibank.   Separate Statement, ¶78.   Any self-serving claim that Plaintiffs
5 | placed their trust in Citibank is irrelevant in the absence of any evidence that
6 | Citibank assumed responsibility for their funds.

7 | Finally, there is no evidence that Citibank ever agreed to become Plaintiffs'
8 | investment advisor.   But even if it had, a fiduciary relationship does not exist
9 | between a customer and an investment advisor unless the customer retained the
10 | agent to "advise him in connection with his investments." *Twomey v. Mitchum,*
11 | *Jones and Templeton, Inc.*, 262 Cal.App.2d 690, 708-709 (1968). No fiduciary duty
12 | exists between a stockbroker and a customer prior to the existence of a contractual
13 | relationship. *Rosenthal v. Great Western*, 14 Cal.4th 394, 425 (1996). At best,
14 | Naqvi and Walsh may have thought about opening IRA accounts with Citibank in
15 | 2004 and 2005 (although they never actually did so), but it is clear they did not
16 | retain Citibank to provide them with investment advice. Separate Statement, ¶79.
17 | In fact, both Plaintiffs testified they had already decided to invest in OCPIN *before*
18 | they even crossed the threshold of Citibank's office. Separate Statement, ¶80.
19 | Plaintiffs did not retain Citibank to "advise them" in connection with their OCPIN
20 | investments.

21 | <div align="center">VII</div>

22 | <div align="center">THE CLAIM FOR NEGLIGENCE HAS NO MERIT</div>

23 | To prevail in a negligence action, a plaintiff must show that the defendant
24 | owed a legal duty, the defendant breached that duty, and the breach proximately
25 | caused injury to the plaintiff. *Garcia v. W&W Community Development*, 186
26 | Cal.App.4th 1038, 1044 (2010). Absent a legal duty, any injury is an injury without
27 | actionable wrong. *Id.* Thus, an essential prerequisite to a negligence claim is the
28 | existence of a duty. *Brown v. California Pension* Administrators, 45 Cal.App.4th

812356.3 | 019930-0419

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1   333, 346 (1996).   Being a question of law, duty is particularly amenable to
2   resolution by summary judgment. *Garcia*, at 1044-1045.

3        Citibank did not owe any common law duties of care to Plaintiffs arising out
4   of the fact that the OCPIN Account was maintained at Citibank.   A bank's basic
5   duty of care in its transactions with it customers arises out of the bank's contract
6   with its customer. *Rodriquez v. Bank of the West*, 162 Cal.App.4th 454, 460 (2008)
7   (allegations that a person was a "putative customer" of a bank not sufficient to
8   establish a bank-customer relationship).   Absent extraordinary and specific facts, a
9   bank owes no duty of care to non-customers.   *Software Design and Application,*
10  *LTD, v. Hoefer & Arnett, Inc.* 49 Cal .App. 4th 472, 478-479  (1996) (existence of
11  duty of care toward another worthy of legal protection is essential prerequisite to
12  negligence, which is determined as a matter of law by the court); *Scott v. Branch*
13  *Banking and Trust*, 588 F.Supp.2d 667,  673 (W.D.V.A. 2008) (bank owes no duty
14  of care to third party that deposits funds into one of its customer's accounts).

15       There are no extraordinary or specific facts that would create a duty of care
16  on the part of Citibank in favor of Plaintiffs.   At best, Plaintiffs were customers of a
17  customer, i.e., OCPIN.   The money Plaintiffs deposited was to OCPIN's account,
18  not to any account in their name.   As a matter of law, Citibank owed no common
19  law duty of care to them.

20  <div align="center">VIII</div>

21  <div align="center">THE CLAIMS FOR NEGLIGENT AND INTENTIONAL</div>
22  <div align="center">MISREPRESENTATION HAVE NO MERIT</div>

23       The elements of a claim for negligent misrepresentation are:  (1) defendant
24  made a representation as to a past or existing material fact; (2) defendant made the
25  representation without any reasonable ground for believing it to be true;  (3) the
26  representation was made with intent to induce plaintiff to rely upon it;  (4) plaintiff
27  was unaware of the falsity of the representation and must have justifiably acted in
28  reliance upon the truth of the representation; and (5) as a result of the reliance upon

812356.3 | 019930-0419

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1  the truth of the representation, plaintiff sustained damage. *Glenn K. Jackson Inc. v.*
2  *Roe*, 273 F.3d 1192, 1201, fn. 2 (9th Cir. 2001) (applying California law).

3  　　　The elements of a claim for intentional misrepresentation are: (1) a material
4  representation was made; (2) the representation was false; (3) defendant knew the
5  representation was false or did not have sufficient knowledge to warrant a belief that
6  it was true; (4) the representation was made with an intent to induce plaintiff to act
7  in reliance thereon; (5) plaintiff reasonably believed the representation to be true; (6)
8  the representation relied upon by plaintiff; and (7) plaintiff suffered damage thereby.
9  *Hobart v. Hobart Estate Co.,* 26 Cal.2d 412, 422 (1945).

10  　　　Plaintiffs' claims for negligent and intentional misrepresentation fail because
11  there is no evidence that any misrepresentation was made and the evidence belies
12  any claim of reliance.  The gravamen of the misrepresentation claim is set forth in
13  paragraphs 35 and 36 of the Complaint, which allege that Citibank advised Naqvi
14  and Walsh that OCPIN was a "prudent and advisable" investment.  The evidence,
15  however, has established the exact opposite.  Naqvi admits he does not recall any
16  representative of Citibank ever telling him that he or she believed an investment in
17  OCPIN was a good investment.  Separate Statement, ¶¶ 36, 82.  The same is true for
18  Walsh.  As described above, Walsh decided to invest in OCPIN *before* he even went
19  to Citibank. Separate Statement, ¶¶ 48 and 80.  Moreover, he testified that at no time
20  during his meeting with Kenney and Amir did they even discuss his investment in
21  OCPIN, and nobody at Citibank told him that an investment in OCPIN was
22  "suitable" for him.  Separate Statement, ¶ 58.

23  　　　Plaintiffs' misrepresentation claims fail for another reason.  There is no
24  evidence that Plaintiffs relied on anything that Citibank told them when they
25  decided to invest in OCPIN.  To be actionable, a representation must be such that,
26  without the representation, the plaintiff would not have entered into the transaction.
27  *Spinks v. Clark* 147 Cal. 439, 444 (1905).  Both Plaintiffs have admitted in their
28  depositions that their respective decisions to invest in OCPIN were made *before*

812356.3 | 019930-0419

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1   they ever spoke with Kenney or Amir.  Separate Statement, ¶¶ 38, 48 and 80.  For

2   example, by the time Naqvi claims to have gone to Citibank to rollover his Putnam

3   IRA he had already invested $500,000 into OCPIN's predecessor (CCPIG) and was

4   a core member of OCPIN handling the daily affairs of the company.  Separate

5   Statement, ¶¶ 6, 22 and 28.  Naqvi could not have reasonably relied on anything

6   allegedly said by Kenney and Amir because he was an insider of the company.  If

7   anybody knew how the company was doing, it would have been Naqvi.

8          Walsh also made the decision to invest in OCPIN before speaking to anyone

9   at Citibank.  Indeed, he decided to invest in OCPIN by July 31, 2005. Separate

10  Statement, ¶ 48.  Walsh based his decision to invest on OCPIN, not on anything that

11  anyone from Citibank told him, but "just on the future of the hospital and being a

12  place where I already worked."  Separate Statement, ¶¶47, 52.  Walsh was so

13  committed to investing in OCPIN that on July 29, 2005, he signed and sent to Carpe

14  the OCPIN Membership Interest Purchase Agreement.  Separate Statement, ¶¶ 53,

15  55-57.  He was contractually bound at that point to purchase the OCPIN shares,

16  which was *before* Mrs. Walsh went to Citibank on August 1, 2005, and *before* Dr.

17  Walsh went to Citibank on August 3, 2005.[9]

18         Moreover, reliance on a misrepresentation is not reasonable as a matter of law

19  if the plaintiff could have ascertained the truth through the exercise of reasonable

20  diligence.  *Lopez v. U.S. Bank Nat'l Assn*, 2010 U.S. Dist. Lexis 90301, *9.  It is

21  indisputable that Naqvi could have ascertained all relevant facts about OCPIN

22  because he was an insider and managed the affairs of the company.  Walsh could

23  have ascertained the same information through the OCPIN Membership Interest

24         [9]  The Membership Purchase Agreement specifically states, among other

25  things, "[t]he parties both represent that Purchaser is acquiring the Interest after

26  private negotiation with OCPIN.  Purchaser has not been attracted to acquire the

27  Interest through publication or any advertisement and this transaction is not being

28  effected through any securities broker or dealer or public offering."  Separate
    Statement, ¶ 55.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

812356.3 | 019930-0419

1  Purchase Agreement, the Hospital Transaction Summary or his communications

2  with Carpe. If Walsh did not see what was in front of him, it was because he did not

3  look. Plaintiffs' misrepresentation claims therefore fail as a matter of law.

4                                            IX

5          THE CLAIM FOR VIOLATION OF SECURITIES LAW HAS NO MERIT

6          In the fifth claim for relief, Plaintiffs contend that Citibank is liable for

7  violation of Corporations Code sections 25235(a) and (b).  Pursuant to this statute,

8  "[i]t is unlawful for any investment adviser, directly or indirectly, in this state: (a) To

9  employ any device, scheme, or artifice to defraud any client or prospective client" or

10 "(b) To engage in any transaction, practice, or course of business which operates or

11 would operate as a fraud or deceit upon any client or prospective client."  Plaintiffs

12 contend that Citibank violated these provisions because it "recommended unsuitable

13 investments all in order to further the interests of OCPIN and Shah and to curry

14 favor with and aid them...."  Complaint, ¶ 105.

15         This claim fails for the reasons described above.  There is no evidence that

16 Citibank, through Amir and Kenney, undertook the role of "investment advisor" for

17 Naqvi or Walsh.  Plaintiffs have already admitted that neither Amir and Kenney nor

18 any representative of Citibank made a misrepresentation concerning the suitability of

19 the OCPIN investments which they relied on in making their decision to invest in

20 OCPIN. The requisite elements of fraud, therefore, contemplated by the statute is

21 absent.  Furthermore, there is simply no evidence in this case (including  Naqvi's and

22 Walsh's deposition testimony) to establish that Citibank and OCPIN were involved

23 in some sort of  scheme to defraud the Plaintiffs.   Separate Statement, ¶¶ 81, 84 and

24 85 .

25         Accordingly, Citibank is entitled to judgment as a matter of law with respect

26 to this claim.

27 ///

28 ///

812356.3 | 019930-0419

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

X

## THE CLAIMS FOR INADEQUATE TRAINING AND FOR AN ACCOUNTING HAVE NO MERIT

Plaintiffs allege that Citibank owed a duty to Plaintiffs to properly train and supervise its employees and breached this alleged duty by failing to do so. Complaint ¶¶ 111-113. This claim is simply a subset of the breach of fiduciary duty and negligence claims and has no merit for the reasons described above. No fiduciary relationship existed between Plaintiffs and Citibank. Whether Citibank adequately trained its personnel to perform fiduciary duties is therefore irrelevant. Citibank owed no common law duty of care to Plaintiffs because they were not customers of Citibank and they decided to deposit their funds directly to OCPIN's account. Whether Citibank adequately trained its personnel to perform duties on behalf of its customers is therefore likewise irrelevant because Naqvi and Walsh were not customers of the bank with respect to the OCPIN account.

Plaintiffs have also alleged a claim for an accounting against Citibank. Complaint ¶¶ 116-117. This claim for relief fails as a matter of law. An action for an accounting must be based on some sort of relationship between the plaintiff and the defendant that requires an accounting. *Teselle v. McLoughlin*, 173 Cal.App.4th 156, 179 (2009). For all of the reasons stated above, there was no such relationship between Plaintiffs and Citibank.

XI

## THE CLAIM BASED ON "TORT OF ANOTHER" HAS NO MERIT

In the Complaint, Plaintiffs have alleged a claim styled as "tort of another". According to Plaintiffs, any time a party is required to bring an action against one party by virtue of the actions of another party, the plaintiff is entitled to an award of party by virtue of the actions of another party, the plaintiff is entitled to an award of attorneys' fees against the party committing the underlying misconduct. Complaint,

1 ¶¶126-128. Under Plaintiffs' reasoning, since the Complaint names two defendants,-

2 -here Citibank, N.A. and Citibank (West) F.S.B.--and Plaintiffs have purportedly

3

4 been forced to bring an action against them because of the alleged misconduct of the

5 other, the tort of another rule applies.

6      Plaintiffs' contentions reflect a profound misunderstanding of the law.  Even

7

8 were Plaintiffs correct that Citibank committed any of the alleged torts in this matter

9 – and Citibank strongly denies this  -- the tort of another doctrine does not allow a

10 party to recover the fees and costs involved in litigating directly with a tortious

11

12 defendant.  *Gorman   v. Tassajara Development Corp.*, 178 Cal.App.4th 44, 80

13 (2009).  Here, despite the fact that two corporate iterations of Citibank have been

14 named in the Complaint, Plaintiffs have litigated this action directly with Citibank

15

16 as a whole and have made no distinction in their allegations between the two named

17 entities.

18      In short, naming two Citibank entities as co-defendants is simply a ploy by

19

20 which Plaintiffs hope to recover attorney fees. However, the circumstances of this

21 case do not merit this and, as such, Citibank respectfully submits that this claim

22

23 should fail as a matter of law.

24 <center>XII</center>

25 <center><u>ALL CLAIMS ASSERTED BY NAQVI ARE BARRED BY THE STATUTE OF</u></center>

26 <center><u>LIMITATIONS IN ANY EVENT</u></center>

27      For all of the foregoing reasons, Plaintiffs' claims have no merit and should be

28 dismissed.  In Naqvi's case, it is also important to note that his claims would be

812356.3 | 019930-0419

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1 barred by statutes of limitation even if they had merit, which they do not.

2       Naqvi's claims are based on the notion that he was misled by Citibank into

3 believing that OCPIN was a safe and secure investment, and that he relied to his

4 detriment on Citibank's alleged misrepresentations.   Complaint, ¶ 35.   However,

5 Naqvi testified at his deposition that he was a member of OCPIN in February 2005

6 when the Private Placement Memorandum ("PPM") was prepared by OCPIN's

7 counsel and approved by its members. Separate Statement, ¶¶ 17, 18.   The PPM

8 contains fifteen pages (pp. 7-22) of "Risk Factors" that warn about the various risks

9 associated with an investment in OCPIN.   On pages 23 and 24, the PPM outlines

10 eight separate categories of "Investor Suitability Standards."   Naqvi admitted that he

11 reviewed the PPM, agrees with everything in it, and signed the document in

12 approximately February 2005 as a member of OCPIN.   Separate Statement, ¶ 18.

13 Thus, even if there was some evidence to support Naqvi's claim that Citibank

14 mislead him into believing the OCPIN investment was "safe" (and there is none), he

15 clearly knew about all of the risk factors associated with an investment in OCPIN by

16 February 2005.   Indeed, Naqvi admitted in his deposition that he was on notice that

17 OCPIN may be a high risk investment when the PPM came out.   Separate

18 Statement, ¶ 65.

19       Naqvi filed this action on August 10, 2009, which is more than four years

20 after he admittedly knew OCPIN was *not* a suitable, low-risk, investment as was

21 supposedly represented to him by Citibank.   All of Naqvi's claims are barred by

22 California statutes of limitation.[10]

23

24       [10]   State statutes of limitation are deemed "substantive" for *Erie* purposes.
Federal courts therefore apply the same statutes of limitation as would be applied in
25 a state court. *Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 110 (1945).
26 The Complaint alleges nine causes of action by Naqvi against Citibank, each of
which is subject to a statute of limitations of four years or less: (1) breach of
27 fiduciary duty – four years (California Code of Civil Procedure ("CCP") Sec. 343;
28 *In re Brocade Communications Systems, Inc. Derivative Litigation*, 615 F.Supp.2d

812356.3 | 019930-0419

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

XIII

CONCLUSION

For the reasons described above, Citibank respectfully submits that its motion should be granted.

DATED: March 11, 2011        FRANDZEL     ROBINS     BLOOM   &amp;
                                 CSATO, L.C.

By: _____/s/_____
      TRICIA L. LEGITTINO
      Attorneys for Defendants Citibank, N.A. and Citibank (West), F.S.B.

1018 (N.D. Cal. 2009)); (2) negligence – three years (CCP Sec. 338(d); *Landale-Cameron Court, Inc. v. Ahonen* (2007) 66 Cal.Rptr.3d 776); (3) negligent misrepresentation – three years (CCP Sec. 338(d); *Vazquez de Mercado v. Sup. Ct.* (2007) 148 Cal. App. 4th 711); (4) intentional misrepresentation – three years (CCP Sec. 338(d); *Id.*); (5) violation of securities laws – three years (CCP Sec. 338(a) (liability created by statute); (6) failure to train and supervise (i.e., negligence) – three years (CCP Sec. 338(d); (7) accounting – four years (CCP Sec. 343; *Manok v. Fishman* (1973) 31 Cal.App.3d 208; (8) breach of written contract – four years (CCP Sec. 337(1); *Century Indemnity Co. v. Sup. Ct.* (1996) 58 Cal.Rptr.2d 69); and (9) tort of another (i.e., negligence.) – three years (CCP Sec. 338(d)).

812356.3 | 019930-0419

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/ADJUDICATION

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000